IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LAURA K. RHODES | ) | CASE NO. |
| 10954 Stone Road | ) | |
| Valley View, Ohio 44125 | ) | JUDGE |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | **(Jury Demand Endorsed Hereon)** |
| v. | ) | |
| | ) | |
| LORAIN COUNTY CHILDREN | ) | |
| SERVICES | ) | |
| 226 Middle Avenue | ) | |
| Elyria, Ohio 44035 | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Laura K. Rhodes (hereinafter referred to as "Rhodes"), states the following as her Complaint against Defendant Lorain County Children Services (hereinafter referred to as "LCCS" or "Defendant"), seeking all available relief under the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201, *et seq*., the Ohio Minimum Fair Wage Standards Act ("OMFWSA"), R.C. Chapter 4111, *et seq*., and the Ohio Constitution, Oh. Const. Art. II, § 34 and R.C. 4113.15.

## JURISDICTION AND VENUE

1.     Jurisdiction over Rhodes' FLSA claim is proper under 29 U.S.C. § 216(b) and 28 U.S.C. §1331.

2.     This Court has supplemental jurisdiction under 28 U.S.C. §1367 over Rhodes' state law claims because those claims derive from a common nucleus of operative facts.  Rhodes'

state law claims are brought pursuant to Ohio Revised Code Chapters 4111, 4113, the Ohio Constitution, Oh. Const. Art. II, § 34, and the doctrines of wrongful discharge in violation of public policy, implied contract, promissory estoppel, and unjust enrichment, as set forth under Ohio common law.

3.      Venue in this court is proper pursuant to 28 U.S.C. §1391(b)(2) in that a substantial part of the events giving rise to Rhodes' claims occurred within this judicial district. Rhodes performed work in this judicial district, and LCCS routinely conducts business in this judicial district.

## PARTIES

4.      At all times relevant herein, Rhodes was a resident of the Village of Valley View, County of Cuyahoga, State of Ohio and is a United States citizen.

5.      From on or about January 5, 2015 through November 7, 2018, Rhodes was an "employee" in the "employ" of LCCS, as defined in 29 U.S.C. §§ 203(e) and (g) and R.C. 4111.03(D)(1) and (3).  From January 5, 2015 through September 4, 2016, Rhodes was classified by LCCS as a "Confidential Secretary" and worked in LCCS' Clerical Department.  From September 4, 2016 until November 7, 2018, Rhodes was classified by LCCS as a "Confidential Data Analyst" and worked in LCCS' Administrative Services Department.  At all times relevant herein, Rhodes was a non-bargaining unit employee.

6.      From on or about January 5, 2015 through November 7, 2018, LCCS did not employ Rhodes in a bona fide executive, administrative or professional capacity and Rhodes did not perform work for LCCS in a bona fide executive, administrative or professional capacity, as defined in 29 U.S.C. § 213(a)(1) and R.C. 4111.03(D)(3)(d).  LCCS classified Rhodes as a "non-exempt" employee under the FLSA.

7.     From on or about January 5, 2015 through November 7, 2018, Rhodes was an employee engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. §§ 206 and 207.

8.     At least from on or about January 5, 2015 through November 7, 2018, LCCS maintained its principal place of business in the City of Elyria, County of Lorain, Ohio and was an "employer", as defined in 29 U.S.C. § 203(d) and R.C. 4111.03(D)(2).

9.     At least from on or about January 5, 2015 through November 7, 2018, LCCS was an "enterprise" and an "enterprise engaged in commerce or in the production of goods for commerce", as defined in 29 U.S.C. §§ 203(r) and (s)(1)(A) and (C).

## FACTUAL ALLEGATIONS

10.     LCCS, founded in 1944, is a public office and an agency of Lorain County that responds to child abuse and neglect referrals.

11.     At all times relevant herein, LCCS employed both bargaining unit and non-bargaining unit employees.  LCCS maintains a collective bargaining agreement ("the CBA") with The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Local No. 2192.  While the CBA applies to bargaining unit LCCS employees, some of its provisions apply to non-bargaining unit employees as well.  Indeed, the CBA specifically delineates when specific provisions apply to non-bargaining unit employees.  Provisions only applicable to bargaining unit employees specifically use the language "bargaining unit employee(s)."

12.     On November 4, 2014, Rhodes submitted an application for employment with LCCS for the Confidential Secretary position.  The employment application contained several paragraphs setting forth conditions of employment with corresponding signature lines for

applicants to initial, manifesting their understanding and consent.  One of these paragraphs, initialed by Rhodes, provided:

> I understand and accept that given the duties and responsibilities of the Employer [LCCS], I may be required to work weekends, evening hours, or at other times determined by the Employer, including overtime hours.

13.     By way of correspondence dated December 17, 2014, Rhodes was extended an offer of employment by LCCS Human Resources Manager Donald R. Starett ("Starett"), which she accepted.  This offer of employment did not classify Rhodes' employment with LCCS as at will.  Notably, no other new hire documents signed and acknowledged by Rhodes at the time of her hire on January 5, 2015 contained any classification that Rhodes' employment was at will.

14.     At all times relevant herein, LCCS did not utilize an automated time tracking system to track hours worked by Rhodes which required her to "clock in/clock out."  Instead, the hours worked by Rhodes, as well as similarly situated employees, were recorded on a "tasksheet" which was then electronically submitted to payroll through a program called Attendance on Demand ("AoD").  LCCS employees were then required to approve this tasksheet in the AoD system.  Essentially, LCCS required that Rhodes, as well as other similarly situated employees, track their own hours worked.

15.     The AoD system documents daily LCCS employee work hours in spreadsheet form with columns depicting the following categories: Date; Schedule; Start; End; Hours; PD; and Amount.  At all relevant times herein, the column labeled "Schedule," was left blank for Rhodes and all similarly situated employees.  The "Start" and "End" columns depict when an employee reported to and left work on each day.  The column labeled "Hours," depicts the number of hours worked by an employee.   The column labeled "PD" depicts the type of pay received by an employee on that day, such as regular pay, sick pay, vacation pay, holiday pay,

and overtime.  Finally, the column labeled "Amount," depicts the actual number of hours that an employee is compensated for each day.

16.     Upon information and belief, the AoD system does not contain a separate category or column depicting when an employee has "clocked in or out" for lunch or breaks. Instead, the AoD system subtracts thirty minutes from the total number of an employee's compensable hours.  For example, the AoD system will document an employee who works a shift from 6:30 a.m. to 3:00 p.m. as "Start" 6:30 a.m., "End" 3:00 p.m., "Hours" "8:30" (eight- and one-half hours), and "Amount" "8:00" (eight hours).  On several occasions, the AoD system documents that Rhodes, as well as similarly situated employees, did clock out for lunch and/or break periods, and then clocked back in to continue work.  Nevertheless, thirty minutes was still deducted from their total compensable hours despite them already being off the clock for these periods.

17.     At all times relevant herein, LCCS utilized an operational policy and personnel manual ("the Manual"), effective April 12, 2016.  The Manual's stated purpose is to provide a systematic and organized approach to the establishment, implementation, and administration of personnel policies and practices, and to assist and guide LCCS employees in the day to day directions and performance of their duties.  All policies adopted in the Manual supersede all previous conflicting, written and unwritten, personnel policies or operational guidelines. Further, the Manual directs that the CBA shall prevail over conflicts between it and the CBA.

18.     The Manual emphasizes that LCCS employees are to fully perform and complete assigned tasks and assignments.  Employees are expected to complete job assignments which they typically do not perform, and, in general, are prohibited from refusing an assignment.

Likewise, even if an employee objects to an assignment, the Manual stresses that it is to be *completed first* before the filing of any complaint.

19.     With regard to overtime, the Manual contains a section entitled "Hours of Work and Overtime Policy," which explicitly defers to the provisions depicted in the CBA.  In essence, the overtime policy contained within the CBA applies to all LCCS employees, bargaining unit and non-bargaining unit alike.  Accordingly, Article 28 of the CBA, entitled "Hours of Work," provides in pertinent part:

> **<u>Section 1</u>**:     The standard work period for all full-time bargaining unit employees shall be forty (40) hours.  The work period for all such employees shall begin at 12:01 a.m. on Sunday of each calendar week and end at 12:00 midnight the following Saturday.
>
> **<u>Section 2</u>**:     Each full-time employee shall be entitled to a one-half hour (1/2) unpaid lunch.  Actual work hours for all full-time employees shall be forty (40) hours in a standard work period.
>
> **<u>Section 3</u>**:     Notwithstanding any other provisions of this article, an employee is ***expected*** to take his lunch during each work day, unless otherwise approved by his supervisor. (***emphasis added***).

20.     Notably, the CBA does not mandate that LCCS employees take an unpaid lunch break during each work day, nor does it prohibit employees from performing work while eating.  Further, the CBA does not mandate that employees record and/or report hours worked.

21.     With regard to employee discipline, Article 3 of the CBA, entitled "Management Rights," grants LCCS the right to suspend, discipline, or discharge employees ***for just cause***.  Moreover, Article 12 of the CBA, entitled "Corrective Action," unequivocally states that "no employee" shall be suspended, discharged, or otherwise disciplined except ***for just cause***.  While the CBA routinely distinguishes between bargaining unit and non-bargaining unit employees, it explicitly does not in requiring just cause for employee termination and discipline.  Similar to the CBA's overtime provisions, Article 3 and Article 12 apply to all LCCS employees.

22.     The Manual also speaks to employee discipline.  Specifically, the Manual states that the LCCS Executive Director, or his designee, will monitor compliance with LCCS policies on an ongoing basis.  Failure of staff to follow operational policies is grounds for corrective action.

23.     The Manual also contains cause for discipline lists for LCCS to follow in administering employee discipline for various infractions.  Specifically, the Manual separates disciplinary infractions into three groups, Group I Offenses, Group II Offenses, and Group III Offenses.  These groups separate the infractions by progression of seriousness.  Each of these groups contains a list of possible infractions, or offenses, coupled with a disciplinary measure for each successive offense.

24.     The Manual defines Group I Offenses as infractions which are relatively minor in nature and which cause minimal disruption to the agency.  Group I Offenses include, in pertinent part, failure to observe established departmental rules or supervisor instructions; failure to observe agency procedures; unsatisfactory work and/or failure to maintain required standards of performance, *e.g.*, productivity, accuracy, completeness; and failure to keep work current based on agency procedures.  Group I Offenses, First Offenses carry with them the disciplinary measure of "verbal reprimand on the record."  Termination for a Group I Offense is only listed as a disciplinary measure for an employee's Fifth Offense in this category.

25.     Group II Offenses are defined as infractions which are of a more serious nature than Group I Offenses.  Group III Offenses, First Offenses carry with them a disciplinary measure of "up to and including termination."  In pertinent part, Group II Offenses include the offense of failure to follow specific directives of a supervisor.  Group II Offenses, First Offenses

carry with them the disciplinary measure of "up to three days suspension without pay." Termination becomes warranted upon an employee's Third Offense in this category.

26.     Group III Offenses are defined as infractions which are of a more serious nature than Group II Offenses. In pertinent part, Group III Offenses include the offense of falsifying testimony, records, or deliberately withholding significant information. A Group III, First Offense carries with it the disciplinary measure of "up to and including termination."

27.     Additionally, the Manual provides guidelines that LCCS will follow with respect to any situation where discipline is a possible outcome. In pertinent part, these guidelines provide the following:

1.     Employees should have forewarning or foreknowledge of the possible or probable disciplinary consequences of the conduct at issue;

2.     The conduct at issue should be reasonably related to:
   a.     The orderly, ethical, efficient, and safe operation of the agency's business;
   b.     The performance that the agency might properly expect of the employee;

3.     LCCS will determine that the employee did in fact violate a policy, procedure, directive, or order of management before taking disciplinary action.

4.     Investigations will be conducted fairly and objectively;

5.     Disciplinary action will only be taken if there is substantiation of the alleged infraction or misconduct;

6.     LCCS will apply its policies, procedures, directives, orders, and penalties even-handedly and without discrimination, to all employees; and

7.     The degree of discipline will be reasonably related to:
   a.     The seriousness of the employee's offense;
   b.     ***The record of the employee in his or her service with LCCS***.

Thus, these guidelines assured Rhodes that she would not be terminated from her employment absent just cause.

8

28.     In addition to the Manual and the CBA, the LCCS Fiscal Department also maintains various operational policies concerning hours worked and overtime.  These operational policies are referred to as "procedures," and include the following titles: "Authorization of Overtime/Comp Time"; "Reporting Paid Time in Attendance on Demand (AoD)"; and "Payroll."

29.     The Authorization of Overtime/Comp Time Procedure, which was authorized by the LCCS Fiscal Department on June 7, 2011, purports to "formalize the authorization and tracking of overtime and comp time in which the employee was not able to adjust/flex their schedule."  This procedure states that before working any overtime, all LCCS employees are to first discuss with their supervisor the nature and need for the overtime and to then obtain written authorization from them.  The procedure also states that employees are encouraged to adjust/flex their work week/schedules whenever possible *in order to avoid or reduce overtime*.  Moreover, it is the responsibility of the LCCS Director of Fiscal Affairs to ensure compliance with this procedure.

30.     The Reporting Paid Time in Attendance on Demand Procedure was authorized by the LCCS Fiscal Department on November 1, 2001 and purports to be an "outline of the process for reporting paid time and a complementary document to Article 28 of the CBA.  This procedure states that all actual hours worked are paid time and must be reported to payroll.  Paid time must be recorded in a tasksheet and electronically submitted to payroll using the AoD system, which the employee is then required to approve.  Similar to the CBA, this procedure does not mandate that employees record and/or report hours worked.  Instead, employees are only required to approve their tasksheet in the AoD system and ensure that it is approved on time.  Moreover, the procedure also contains a section describing when employee paid time begins and ends.  This section declares that "meal times during which agency business is

discussed is only paid time if the employee is required to attend that meal."  However, like the CBA, this procedure does not mandate that employees take an unpaid lunch break during each work day, nor does it prohibit employees from performing work while eating.

31.     The Payroll Procedure, authorized on July 1, 2002, purports to implement correct accounting and operational procedures to record bi-weekly payroll.  This procedure states that each employee is to submit a "time card" through the AoD system to payroll.  Notably, this procedure does not state that employees are responsible for approving their "tasksheet" in the AoD system.  Nor does this procedure make any mention of the term "tasksheet," as described in the Reporting Paid Time in Attendance on Demand Procedure.  This procedure also fails to reconcile or explain the interrelationship, if any, between "tasksheets" and "time cards."

32.     The Payroll Procedure states that it is the responsibility of the LCCS Financial Supervisor to review and make adjustments to employee time cards, and then to email the employee and their direct supervisor stating such adjustments.  The Financial Supervisor is responsible for reviewing all employee overtime and ensuring that all changes to the time cards derived from overtime are verified.  Further, the Financial Supervisor is responsible for maintaining all payroll time cards, payroll reports, payroll worksheets, payroll registers, adjustments, and approved "sheets" from supervisors and managers.  The term "sheets" is undefined but presumably purports to include any and all documents relating to an employee's compensable hours worked.

33.     From on or about January 5, 2015 through September 4, 2016, Rhodes adhered to a job description providing both a job summary and essential job functions for the Confidential Secretary 3 position ("the Secretary Description").  The Secretary Description was prepared by

the LCCS Human Resources Manager of the Clerical Unit, Donald R. Starett in January 2015 and signed and acknowledged by Rhodes on January 1, 2015.

34.     The Secretary Description provides the following job summary: "under administrative direction, operates a personal computer and/or typewriter, takes and transcribes dictation, prepares typed copy from rough drafts, prepares and processes confidential information; typies correspondence and reports, answers telephone inquiries, and routes to proper individual; greets the public, attends meetings, and records minutes; schedules meetings."

35.     The Secretary Description also provides in pertinent part the following essential job functions: ensures that all documents are filed and maintained in accordance with agency practices and procedures; responsible for the maintenance and storage of all closed records both at the agency and at the Gates building; processes all GAL [guardian ad litem] review requests including scheduling the review, retrieving and preparing the record and documenting the review; and processes all external record review requests and following management instructions prepares the record and delivers the record per the request.

36.     By way of correspondence dated, September 2, 2016, Rhodes was offered a promotion to the position of Confidential Data Analyst for the Administrative Services Unit by LCCS Executive Director Scott Ferris ("Ferris").  In addition to the offer of promotion, this letter also stated that "approved overtime and comp time is available with prior approval."

37.     From on or about September 4, 2016 through November 7, 2018, Rhodes adhered to a job description providing both a job summary and essential job functions for the Confidential Data Analyst position ("the 2016 Analyst Description").  The 2016 Analyst Description was originally prepared by then LCCS Human Resources Manager for Administrative Services, Laura A. Gleason ("Gleason") in August 2016 and signed and

acknowledged by Rhodes on September 2, 2016.  Subsequently, the Analyst Description was formally altered on August 28, 2018 by Amanda Pittner ("Pittner"), who replaced Gleason as the Administrative Services Human Resources Manager, assuming the position in August 2017.

38.     The 2016 Analyst Description provided the following job summary, which remained unchanged throughout Rhodes' tenure: under supervision, operates a computer to enter/retrieve data and to prepare a variety of operational reports; determines eligibility for various programs; maintains a working knowledge of program requirements; maintains a variety of records; and performs other related duties as required.  Accordingly, Rhodes' job duties did not require the exercise of independent judgment or discretion with respect to matters of significance.

39.     The 2016 Analyst Description provided in pertinent part the following essential job functions: performs confidential secretarial duties as instructed by supervisor, provides clerical support to the Human Resources Manager, provides back up coverage to the front desk/reception area as needed; records and distributes minutes for various management meetings including but not limited to ISP, All Management meetings, and LCCS Board meetings; accurately files various records and documents including but not limited to personnel files and client records in accordance with agency practices and procedures, facilitates and tracks peer reviews and coordinates GAL reviews; and responsible for the maintenance and storage of all closed records both at the agency and at the Gates building, processes all external record review requests and follows management instructions to prepare and deliver the record as requested.

40.     At all times relevant, the 2016 Analyst Description also provided that other duties and responsibilities of the position included acting as "Agency Receptionist."

41.     From on or about January 5, 2015 through November 7, 2018, LCCS paid Rhodes on an hourly basis but failed to pay her overtime for all hours worked over 40 hours in a week. In calculating her overtime compensation, LCCS did not include Rhodes' time spent working during break and meal periods; sick days; personal days; holidays; before shift; and nighttime.

42.     From on or about January 5, 2015 through November 7, 2018, Rhodes' usual shift was Monday through Friday, from 6:30 am to 3:00pm, but worked over 40 hours in a week.

43.     At all times relevant, LCCS continually impressed upon Rhodes the importance of getting all assigned work tasks quickly completed, regardless of their size and scope.  In fact, LCCS, both directly and indirectly, encouraged Rhodes to underreport her actual hours worked in order to meet deadlines and to complete assignments, all while espousing the need to quickly complete assignments above all else.

44.     Subsequent to her promotion to the Confidential Data Analyst position, Rhodes' assigned tasks significantly increased in volume and her essential job functions became increasingly confusing and unclear.  Her new position subsumed many of her previous secretarial functions and duties while simultaneously creating new responsibilities.  Rhodes also assumed the unfinished tasks of her predecessor, who had left a significant amount of work unfinished upon her retirement.  Moreover, there existed a constant overlap as to job functions between Rhodes and other Administrative Services Unit employees.  Often, there lacked any clear directive as to which particular task each individual employee was responsible for.

45.     In addition to job function overlap between Rhodes and secretaries in the Administrative Services Unit, there also existed an overlap between Rhodes' functions and those of Patricia Kushner ("Kushner"), another Confidential Data Analyst in the Administrative Services Unit.  Interestingly, while the job descriptions of Rhodes and Kushner were slightly

13

different, these job descriptions shared many of the same essential functions.  For instance, Rhodes and Kushner were both responsible for performing secretarial duties, backing up the front desk and reception area, recording minutes, scheduling and facilitating GAL reviews, data retrieval, recommending and purchasing equipment and supplies, tracking office supply inventory, and maintaining various record storage areas.  Kushner and Rhodes also both reported to Administrative Supervisor Kim Kassam ("Kassam") and Pittner.  Rhodes and Kushner's position descriptions also provided differing job functions.  For instance, unlike Rhodes, Kushner was directly responsible for providing oversight for the transportation of closed records to the Gates Building.

46.     Additionally, Kushner, who was hired on January 8, 2018, has a familial relationship with LCCS Direct Services Manager Julie Haight ("Haight").  Haight is also Pittner's supervisor.  At the time of her hire, Kushner entered into a nepotism policy agreement with Haight, Pittner, and Kassam.  This agreement sets forth that Kushner is to be supervised by Kassam, and to discuss any conflict of interest or issue which could have a negative impact on the work environment.  Further, the agreement states that Kassam and Pittner are to work together to address, resolve, and manage any issues involving conflict of interest, *or other matters related to work performance*.

47.     In addition to the job function confusion, the Administrative Services Unit had entered into a state of transition shortly after Rhodes' promotion.  Specifically, Gleason's employment with LCCS ended in September 2016.  In the interim, Pittner was promoted to the Human Resources Manager position on August 4, 2017.  Pittner officially assumed this role on August 21, 2017, commencing a yearlong probationary period.  Pittner struggled with micromanagement in her previous supervisory capacity with LCCS and brought to this new role

a philosophy of "understanding the culture of LCCS," "bringing in successful people," and "stopping paranoia and issues that come with termination." Pittner began her tenure by updating numerous LCCS procedures and implementing a new strategic planning process.

48. As a result, the Administrative Services Unit was experiencing an influx of new hires, restructuring, and even the physical relocation of various offices. Storage space also became increasingly sparse and limited causing disorganization and the bogging down of record filing. Moreover, Rhodes' prior position of Confidential Secretary 3 was eliminated, leaving her to further incorporate her previous duties into her new position. Consequently, the Administrative Services Unit was not functioning effectively, and Rhodes began to struggle with timely completing the increased multitude of tasks.

49. Rhodes, due to the nature and volume of tasks assigned to her, often was required to work through break and meal periods in an effort to timely complete them. In addition, some of Rhodes' co-workers began complaining about the time it took her to complete tasks and that she was "not getting things done."

50. Rhodes was told by LCCS managerial staff that despite any established procedures for working overtime, she was "just expected" to come in early and to stay late in order to complete assigned tasks. In essence, Rhodes was expected to work off the clock to ensure that all of her assignments were timely completed. Consequently, Rhodes, in an effort to complete her work, and in keeping with the LCCS mantra of doing so while avoiding overtime, began under reporting her daily actual hours worked.

51. Subsequently, on June 22, 2018, Rhodes, who, had grown concerned about the nature and scope of her essential job functions, met with Pittner. Rhodes sought to voice her concerns about the overlap of various job duties and sought clarification as to just what tasks her

15

essential functions encompassed. Due to the overlap and confusion, Rhodes was also concerned that her job may now be in jeopardy. Pittner decided to schedule a joint meeting between herself, Rhodes and Rhodes' direct manager, Kassam, to address these concerns.

52. Prior to assuming the Administrative Supervisor position in 2015, Kassam, like Rhodes, had previously served as both a secretary and a data analyst. Accordingly, Kassam was well acquainted with the nature and scope of the functions and tasks affiliated with these positions. Now, as the Administrative Supervisor, one of Kassam's essential job functions was: "The establishment and maintenance of client record systems, ensuring security and retrieval. Establishes procedures and systems for maintenance of agency records in adherence to public record law requirements."

53. The scheduled joint meeting was held on July 11, 2018 and centered around an attempt to clarify Rhodes' essential job functions with the goal of both clearly defining what they were and/or should be, and identifying exactly what tasks they encompassed. To this end, Pittner and Kassam reviewed with Rhodes the 2016 Analyst Description, as well as Rhodes' notes identifying the various tasks she was currently performing. Throughout this meeting, it became evident that Pittner was far more concerned that tasks be speedily completed as opposed to clearing up any confusion. Essentially, Pittner was more interested in the Administrative Service Unit's quick output of job tasks than she was in clearly defining Rhodes' responsibilities in relation to these tasks.

54. At the onset of the meeting, Pittner stated that LCCS was "in a state of transition," "in a new era of changing some stuff up," "moving files out from offices," and "getting back to functioning effectively now that a position was filled in their new department." Pittner further stated that the 2016 Analyst Description needed to be updated, while Kassam acknowledged that

she too was confused as to Rhodes' job functions and which tasks Rhodes was responsible for. Kassam further acknowledged that there was a "blurring of lines" between the essential functions outlined in the 2016 Analyst Description and those in the and Administrative Services Unit secretary job descriptions.  Accordingly, the various tasks that each position was responsible for was unclear.

55.     Kassam mentioned that there had been a "secretary meeting" in the Administrative Services Unit to address these same concerns and in an attempt to clarify the secretarial job functions and corresponding tasks.  During this secretary meeting, when presented with the tasks for which they were responsible, various secretaries voiced their confusion, with some even commenting "isn't Rhodes doing that?"  A checklist outlining the essential functions and tasks of the secretary position had also been vocally objected to during this meeting. Accordingly, Kassam stressed that they now needed to clearly define the functions of both the data analyst and secretary positions, the tasks that each position would be responsible for, and to clarify to the secretaries, "here are the situations where you don't bother Rhodes."  Pittner agreed, adding that Rhodes' position description was outdated and needed to be revised.

56.     Thereafter, Pittner began questioning Rhodes about the tasks she was currently working on and her processes for completing them.  At this point, Pittner became ever more focused on Rhodes' timeliness in completing tasks, despite just acknowledging the overlap and overall confusion surrounding them.  Pittner even implied that Rhodes was to blame for the slow output in production of the Administrative Services Unit.

57.     The first task discussed was the filing of "closed client records."  This task involved the identifying, labeling, tracking, boxing, and the alphabetical filing of voluminous records, both current and historical, with some records dating back several years.  This task also

17

required lifting and physical moving of the files from room to room at the Agency and from the Agency to the Gates Building.  Rhodes informed Pittner that she was currently backed up with this task because the filing cabinets were completely full and storage space was extremely limited.  Moreover, this was not even accounting for the numerous records predating 2018. Rhodes explained that while she was not far behind in filing 2018 records, completion of the task would require that the 2016 records and boxes containing other records be moved to create space.  Kassam confirmed that they were out of room to store the records and that performing this task was "tricky."

58.     Another task discussed was that of "loose filing."  Rhodes was also backed up with this task due to the ever-increasing accumulation of "loose documents," and completion being largely contingent upon the filing of closed client records.  This task involved the identifying and filing of a multitude of loose documents at the Agency and the Gates Building with their corresponding record, both current and historical.  The loose documents needed to be organized, itemized, and matched to the appropriate record.  Additionally, loose documents at the Agency which corresponded to records already at the Gates Building needed to be transferred there for filing after locating the matching record.  Due to the magnitude of this task, and the overlap in job functions among potions in the Administrative Services Unit, it was often overwhelming.

59.     Further, the task of loose filing was never specifically defined or identified in any of Rhodes' position descriptions.  Furthermore, "transportation" of records was also never identified in any of Rhodes' position descriptions.

60.     Rhodes explained that because closed client record filing had not yet been completed, she had not been able to travel to the Gates Building to finish loose filing there.

Moreover, the backup in loose filing stemmed from circumstances completely outside of Rhodes' control and predating her promotion to the Confidential Data Analyst position. Specifically, a significant amount of unfiled documents had been left over from the retirement of Rhodes' predecessor.  Additionally, a secretary, also assigned to this task, failed to file a large number of loose documents dating back to historical records from 2014 and 2015.  As a result, Rhodes assumed the added duty of attending to these documents as well as those that she was already responsible for.  Rhodes stated that she had begun taking stacks of loose documents to the Gates Building for sorting and filing there, but that she was nevertheless still backed up.  In this regard, Rhodes indicated that she had just finished moving loose documents for the 2015 records to the Gates Building and was currently transporting loose documents for the 2016 records.

61.     Pittner simply replied that "this was just a part of Rhodes' job," only questioning how long it was going to take for Rhodes to do these tasks.  Kassam then explained the prior process utilized for completion of these tasks.  Specifically, Kassam would box the record and put these boxes in a room.  Simultaneously, Rhodes would go through these records, itemize them on a spread sheet, and then have labels made for their filing.  Kassam would then take the boxes to the Gates Building to be filed.  Kassam subsequently asked Pittner if she should utilize this past process to assist Rhodes or if Pittner preferred that Rhodes work alone.  Affirming the later, Pittner declared that "this was one of Rhodes' duties," and "a part of her job description." Further, Pittner emphasized that "if a due date was set, the task must be done."

62.     Notably, Pittner and Kassam failed to address that transportation of the records to the Gates Building was not identified as an essential function in Rhodes' position description.  In

fact, the transportation of records was specifically mentioned as an essential function in Kushner's position description.

63.     Interestingly, Pittner also neglected to mention any of the previously discussed reasons as to why there was a delay in the completion of these tasks in the first place!  Nor did Pittner elaborate on why the past process identified by Kassam should no longer be utilized. Instead, Pittner designated all responsibility for completing these tasks onto Rhodes despite moments earlier acknowledging the departmental confusion, overlap, magnitude, and current difficulties in performing them.

64.     Pittner continued to press Rhodes for "a realistic time estimate" on completing these tasks.  Rhodes replied that she was unsure because Pittner was enforcing a new process that she had never done before.  Kassam then proceeded to ask Rhodes if there were any parts of the discussed tasks that she could not do.  Rhodes mentioned that she had a problem lifting the boxes due to her back, and that she had previously mentioned this to Kassam.  At the time, Kassam informed Rhodes that she did not need a doctor's note or any special accommodation.  The lifting had been an issue for Rhodes since at least 2014 when she first started taking boxes of records to the Gates Building. Rhodes indicated that during this period, Kassam had assisted her with lifting activities.

65.     Pittner then discussed and made arrangements for Rhodes to acquire a doctor's note and get an accommodation.  Pittner explained to Rhodes, "we need to figure out what tasks you can do because we need to do some rearrangement."  Pittner told Rhodes that she needs someone to get the records filed and up to date as fast possible, and that she felt as though they were "spinning their wheels" if Rhodes did not have a doctor's note.  Notably, Pittner did not

question Kassam as to why she advised Rhodes that she did not need a doctor's note.  At this point, Pittner and Kassam decided to put revisions to Rhodes' job description on hold.

66.     Pittner emphasized that they needed to get Rhodes "meeting deadlines and the essential functions of her job."  Pittner and Kassam also declared that they "needed to take a bigger look at the essential functions of Rhodes' job.  Pittner and Rhodes then scheduled another meeting with Rhodes for August 14, 2018, and decided that they would meet before this meeting, apart from Rhodes, to review Kushner and Rhodes' job descriptions and switch their tasks up.  It was further decided that Rhodes would not transport the 2016 closed client records to the Gates Building.  Instead, Rhodes would be solely responsible for filing all closed records yet to be filed, and completing all loose filing by August.

67.     Finally, Pittner decided that she wanted to see how Rhodes was spending her time and the daily tasks that she was performing.  Accordingly, Pittner instructed Rhodes to begin keeping a daily time journal, documenting her tasks and how long they took her to complete.  Rhodes was further instructed to provide these journals to Pittner and Kassam at the end of each week.   Rhodes was also instructed to record what the secretaries expect her to be doing.  Finally, Pittner suggested that they should draft a document delineating and distinguishing Rhodes' tasks from the secretaries' tasks.

68.     Before adjourning the meeting, Pittner stated that for a long time there had been so much influx with the Confidential Data Analyst position that the department had not been able to "get down to brass tacks with what is going on," and that they had discovered "a lot of stuff that has gone by the wayside and fallen through the cracks."

69.     Subsequently, pursuant to Pittner's instructions, Rhodes began journalizing and submitting her daily work activities and hours.  Rhodes engaged in this practice from July 2018 through the time of her administrative leave on October 17, 2018.

70.     The next meeting between Rhodes, Pittner, and Kassam occurred on August 14, 2018.  At this meeting, Pittner and Kassam assessed that Rhodes was still behind in completing various tasks and unable to meet set completion deadlines for them.  Further, Pittner and Kassam confronted Rhodes over her submitted time studies, pointing out that the hours documented in the studies did not "add up" to eight hours' worth of daily work.

71.     Despite their knowledge of the work hour discrepancies documented in the weekly time journals and Rhodes' untimely completion of assigned tasks, neither Pittner nor Kassam counseled or discussed any overtime concerns with Rhodes until October 16, 2018. Likewise, Rhodes was also never contacted by the LCCS Financial Supervisor during this period concerning any work time discrepancies.  In conjunction with the time discrepancies, both Pittner and Kassam were fully aware of the underlying reasons as to why Rhodes was not up to date in her work.  Thus, LCCS knew or had reason to know that Rhodes was engaging in unpaid overtime work and underreporting her hours.

72.     On September 6, 2018, Pittner and Kassam conducted a performance evaluation of Rhodes.  Per the Manual, LCCS may complete annual performance evaluations of an employee, *which are to be based upon defined and specific criteria*.  The results of an evaluation are documented on a form listing the essential functions contained in an employee's position description with a corresponding section consisting of three rating classifications: meets expectation; needs improvement; and unacceptable.  If an employee is rated as "needs

22

improvement" with regard to one or more essential functions, LCCS will institute a performance action plan to correct and increase performance.

73.     Prior to September 6, 2018, Rhodes had received three performance evaluations, including one as recent as March 19, 2018, where she was rated as "meeting expectation," the highest classification, with regard to all essential functions of her job.  In fact, during her employment with LCCS, Rhodes was an exceptional and competent employee who established an excellent employment record through her service.

74.     On the September 6, 2018 performance evaluation, however, Rhodes was rated as needing improvement and put on a performance action plan with regard to the following essential job functions listed on her position description: 1.) operating a personal computer to enter/retrieve data and to prepare a variety of operational records and reviewing and verifying the accuracy and completeness of a variety of documents; and 2.) accurately filing various records and documents for client records in accordance with agency practices and procedures. Specifically, Pittner identified that these items were based on a 2015 record database entry that was not updated timely and the incomplete loose filing.   However, these tasks were not explicitly specified on the actual evaluation document or the position description.  Additionally, no further clarification was given to Rhodes in defining the tasks encompassed by her essential functions.  Nor was Rhodes' position description revised as discussed during the July 11 meeting.

75.     The performance action plan was initiated for a ninety-day period, to be completed on December 5, 2018.  As part of the performance action plan, Rhodes was to continue meeting with Pittner and Kassam twice per month in order to review efficiency and develop a plan for prioritizing and complete tasks when faced with with multiple requests and

deadlines.  Moreover, during these meetings, Pittner and Kassam were to outline to Rhodes how much time each task should take to complete, creating agreed upon timeframes.

76.     During the evaluation, Rhodes confirmed to Pittner that the 2015 database task had been completed.  This, however, had no impact or bearing on the establishment of the performance action plan even though it was partially the basis for it being instituted. Pittner simply stated that Rhodes' next deadline was for loose filing and did not amend the plan. Thereafter, the next meeting was scheduled to occur on September 13, 2018.

77.     On October 1, 2018, another meeting held between Rhodes, Pittner, and Kassam. During this meeting, Rhodes' progress with transporting files was addressed.  Kassam stated that completion of this task could be potentially pushed out three weeks.  Rhodes explained that another employee in the Administrative Services Unit, Nida LNU, had forgotten to take several files to the Gates Building and that Rhodes had emailed her inquiring as to whether she could take them for her.  Kassam noted that the filing cabinets were full and that loose filing in respect to these records would be difficult with no easy solution.  Kassam, who was preparing to leave for a vacation, suggested that Rhodes "stash" records in Kasam's office or in the Lorain County prosecutor's office, but otherwise proclaimed that "she had no other answers."

78.     On October 16, 2018, Pittner and Kassam met again with Rhodes with Rhodes to review the discrepancies in hours worked between Rhodes' time studies and the AoD system.  At the onset of this meeting, Pitnner confronted Rhodes and questioned Rhodes' understanding of LCCS overtime policy.   Rhodes replied that her understanding was that overtime needed to be requested and approved.  Pittner then questioned Rhodes as to her knowledge of working during lunch breaks and whether approval is required for this work as well.  Rhodes replied that she was not sure if approval was required.  Pittner then voiced her concerns that she observed

discrepancies between Rhodes' reported hours worked on her timecards and those identified in the time studies.  Pittner further stated that she could identify to Rhodes all time discrepancies.

79.     When questioned by Pittner as to whether she was aware that she was underreporting hours, Rhodes stated that she was using the unreported time because she felt that she needed it to complete her assigned work during the day.  Moreover, Rhodes explained that she was using the unreported time because Pittner had informed her that she was not getting her work done.  Pitter then incorrectly stated that per LCCS' policy and procedure, an employee must request and obtain authorization from their supervisor in order to "work through lunch," and to "work over."

80.     Rhodes informed Pittner that she had been previously informed by LCCS managerial staff that she was expected to "just come in early and stay late and just do that," contrary to the LCCS policy.  Incredibly, Pittner never questioned Rhodes as to which manager told her this. Interestingly, Kassam was Rhodes' direct supervisor throughout her employment with LCCS.  Kassam, however, remained silent on this matter.  Pittner simply stated that "the difference between whatever those people are saying and your situation is that you actually have it documented that you worked a certain amount of hours and a time study."  Pittner elaborated that she and Kassam had compared Rhodes' time studies with Rhodes' actual reported time. Pittner further stated that from these comparisons, there was a clear indication that Rhodes was underreporting her actual time worked since at least July 2018.

81.     Pittner and Kassam then began reconciling with Rhodes her time studies and reported hours in order to determine any overtime due to Rhodes.  Pittner declared that she would take a report of these findings to the LCCS Fiscal Department to determine and pay out to Rhodes any unpaid overtime.  Pitter also told Rhodes that from that day forward, she was to

always get approval and permission to work through lunch and to work any type of overtime. Pittner also noted that she would be documenting that Rhodes had not met the October 12 completion date for loose filing.  Finally, Pittner stated that after meeting with the Fiscal Department, she would determine corrective actions for Rhodes.

82.     By way of correspondence from Pittner dated October 17, 2018, Rhodes was placed on immediate paid administrative leave pursuant to potential misconduct.  Rhodes was informed that a pre-disciplinary conference would be held to adjudicate her alleged misconduct and that she would remain on leave pending the issuance of a decision by LCCS Executive Director Scott Ferris regarding the results of said conference.

83.     On October 31, 2018, LCCS, by and through its District Services Manager Christina Turcola, conducted a pre-disciplinary conference concerning various charges of misconduct against Rhodes.  Specifically, these charges included two Group II, First Offenses for: 1.) failure to observe agency procedures and 2.) failure to follow specific directives of supervisor; and one Group III, First Offense for: 1.) falsifying records or deliberately withholding significant information.  Interestingly, those offenses identified as Group II Offenses are actually listed in the Manual as Group I Offenses.

84.     In anticipation of the conference, Kassam prepared three Pre-Disciplinary Conference Just Cause Statements dated October 17, 2018, October 19, 2018, and October 23, 2018, outlining a "summary of evidence" for each of Rhodes' alleged offenses.  While all of these statements are otherwise identical, they all fail to classify The Group II Offenses as Group I Offenses per the Manual.

85.     As to the Group II, First Offense of failure to observe agency procedures, Kassam noted that Rhodes failed to follow the hours of work and overtime policy outlined in the Manual

and the CBA, regarding approval for working through lunch.  Kassam further noted that Rhodes did not follow the Authorization of Overtime/Comp Time Procedure, the Reporting Paid Time in Attendance on Demand Procedure, or the Payroll Procedure.  However, as stated *supra*, none of these materials describes any such procedure concerning an employee first obtaining approval to work through lunch.  Moreover, none of these materials mandates that employees take an unpaid lunch break during the work day, nor do they prohibit employees from performing work while eating.

86.     By way of correspondence dated November 6, 2018, LCCS officially notified Rhodes that she was terminated from her position of Confidential Data Analyst, effective November 7, 2018.  In this correspondence, LCCS informed Rhodes that her termination was based on "substantiated infractions and misconduct of failure to observe agency procedures, failure to follow specific directives of supervisor and falsifying records or deliberately withholding significant information."  Effectively, LCCS informed Rhodes, that it was terminating her for "just cause."

87.     At all times relevant herein, LCCS reasonably expected Rhodes to rely on representations that she would be discharged only upon compliance with the disciplinary procedures set forth in the Manual.  Moreover, Rhodes detrimentally relied on these representations through the course of her employment and in proceeding through the disciplinary process which resulted in the October 31 pre-disciplinary hearing.  In fact, by inducing Rhodes to detrimentally rely upon its disciplinary guidelines and procedure, LCCS effectively converted Rhodes' employment from at-will to that of a contractual nature.

88.     At least from on or about January 5, 2015 through November 7, 2018, LCCS knew its obligations under the federal and Ohio laws governing employee pay and overtime compensation.

## FIRST CAUSE OF ACTION

89.     All the foregoing allegations contained in paragraphs 1-88 of the Complaint are hereby re-stated and re-alleged as if fully incorporated herein.

90.     By engaging in the above-described acts and omissions, which acts and omissions were willful, intentional, extreme and outrageous, Defendant knowingly and willfully violated the FLSA by failing to pay Rhodes for all hours worked; and failing to pay Rhodes all overtime compensation due her.

## SECOND CAUSE OF ACTION

91.     All the foregoing allegations contained in paragraphs 1-90 of the Complaint are hereby re-stated and re-alleged as if fully incorporated herein.

92.     By engaging in the above-described acts and omissions, which acts and omissions were willful, intentional, extreme and outrageous, Defendant knowingly and willfully violated the OMFWSA and the Ohio Constitution, Oh. Const. Art. II, § 34 by failing to pay Rhodes for all hours worked; and failing to pay Rhodes all overtime compensation due her.

## THIRD CAUSE OF ACTION

93.     All the foregoing allegations contained in paragraphs 1-92 of the Complaint are hereby re-stated and re-alleged as if fully incorporated herein.

94.     By engaging in the above-described acts and omissions, which acts and omissions were willful, intentional, extreme and outrageous, Defendant knowingly and willfully failed to

pay Rhodes all wages owed to her within 30 days of her regularly scheduled paydays in violation of R.C. 4113.15.

## FOURTH CAUSE OF ACTION

95.     All the foregoing allegations contained in paragraphs 1-94 of the Complaint are hereby re-stated and re-alleged as if fully rewritten herein.

96.     By engaging in the above described acts and omissions, which acts and omissions were intentional, willful, extreme and outrageous, Defendant has wrongfully discharged Rhodes in violation of public policy.

## FIFTH CAUSE OF ACTION

97.     All the foregoing allegations contained in paragraphs 1-96 of the Complaint are hereby re-stated and re-alleged as if fully rewritten herein.

98.     By discharging Rhodes from employment without just cause, contrary to the operational policy and personnel manual, Defendant has discharged Rhodes in violation of an implied employment contract thereby causing her harm.

## SIXTH CAUSE OF ACTION

99.     All the foregoing allegations contained in paragraphs 1-98 of the Complaint are hereby re-stated and re-alleged as if fully rewritten herein.

100.     Defendant breached the promises and representations contained in the operational policy and personnel manual, upon which Rhodes detrimentally relied on these promises and representations through the course of her employment, and Defendant is estopped from terminating her employment without just cause.  In fact, by inducing Rhodes to detrimentally rely upon its disciplinary guidelines and procedure, LCCS effectively converted Rhodes' employment from at-will to that of a contractual nature.

## SEVENTH CAUSE OF ACTION

100.    All the allegations contained in paragraphs 1-99 of the Complaint are hereby restated and re-alleged as if fully rewritten herein.

101.    At all relevant times hereto, Defendant devised and implemented a plan to increase its budget and/or profits by fostering a scheme of securing work from Rhodes without paying overtime compensation for all hours worked.

102.    Contrary to all good faith and fair dealing, Defendant induced Rhodes to perform work while failing to pay overtime compensation for all hours worked as required by law.

103.    By reason of having secured the work and efforts of Rhodes without paying overtime compensation as required by law, Defendant enjoyed reduced overhead with respect to its labor costs, and therefore realized additional earnings and profits to its own benefit and to the detriment of Rhodes.  Defendant retained and continues to retain such benefits contrary to the fundamental principles of justice, equity, and good conscience.

104.    By engaging in the above-described acts and omissions, which acts and omissions were intentional, willful, extreme and outrageous, including receiving and benefiting from the uncompensated labors of Rhodes, Defendant has been unjustly enriched.

WHEREFORE, Rhodes respectfully requests that this Court grant her the following relief against Defendant:

1.    Compensatory damages for all unpaid compensation, including overtime compensation, the exact amount to be determined at trial; and

2.    Liquidated and/or treble damages as allowed by the FLSA, the OMFWSA, the Ohio Constitution, Oh. Const. Art. II, § 34 and R.C. 4113.15; and

3.      Compensatory damages for wrongful discharge; and

4.      Punitive damages to be determined at trial; and

5.      Pre-judgment and post-judgment interest on damages; and

6.      Reasonable attorney fees and costs; and

7.      Such further relief as this Court deems necessary and appropriate.

CONSOLO LAW FIRM CO., LPA


/s/ Frank Consolo
FRANK CONSOLO [0042455]
HORACE F. CONSOLO [0096571]
627 West St. Clair Avenue
Cleveland, OH 44113
(216)696-5400 FAX (216)696-2610
fconsolo@consololaw.com
hconsolo@consololaw.com
*Attorney for Plaintiff Laura K. Rhodes*


<u>JURY DEMAND</u>

Plaintiff Rhodes requests a jury trial on all legal matters contained in the Complaint.

/s/ Frank Consolo
FRANK CONSOLO [0042455]